# In the United States Court of Federal Claims

|  |  |
|---|---|
| JENNIFER A. NIKOLAISEN, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> THE UNITED STATES OF AMERICA, ) <br> ) <br> Defendant. ) <br> ) | No. 24-1655L <br> (Filed: October 23, 2025) |

Stephen J. Clarke, Waldo & Lyle, P.C., Norfolk, VA, with whom was Blake A. Willis, for Plaintiff.

Jennifer A. Sundook, Trial Attorney, Natural Resources Section, Environmental and Natural Resources Division, United States Department of Justice, Washington, DC, with whom on the briefs and at argument was Mark A. Pacella, Trial Attorney, and with whom were Lisa L. Russell, Deputy Assistant Attorney General, and Adam R.F. Gustafson, Acting Assistant Attorney General, for Defendant.

## OPINION AND ORDER

In August 2021, Plaintiff, Jennifer A. Nikolaisen, purchased a house located in the Town of Quantico, Virginia (the "Town" or "Quantico") as an investment, with the intent to make it available for short-term rentals. Because the Town is surrounded on one side by the Potomac River and on three sides by the Marine Corps Base Quantico (the "Base" or "Base Quantico"), to reach the Town by land residents and visitors must either take the train or drive through the Base on Fuller Road. Ms. Nikolaisen alleges that the restrictions imposed on prospective renters and other visitors to her property by the Marine Corps' access control policies have effected a taking of her property without just compensation in violation of the Fifth Amendment.

Before the Court is the government's Motion to Dismiss for failure to state a claim pursuant to RCFC 12(b)(6). Def.'s Mot. to Dismiss, ECF No. 7. The government alleges that, even accepting all of Ms. Nikolaisen's assertions as true, she does not have a plausible claim for relief under the Takings Clause.[1]

---

[1] In its Motion, the government also alleged that Ms. Nikolaisen's takings claim was barred based on both claim and issue preclusion. It has since expressly abandoned that defense. ECF No. 12.

The Court heard oral argument on the government's Motion to Dismiss on September 25, 2025. See Hearing Tr., ECF No. 15. For the reasons set forth below, the government's Motion is **GRANTED**.

## BACKGROUND[2]

### I.  Base Quantico

The United States established Marine Corps Base Quantico in 1917. United States v. Watson, 80 F. Supp. 649, 650 (E.D. Va. 1948). It initially leased the land on which the Base would be located but then acquired the fee simple title to the property in 1918. Id.; see also Act of July 1, 1918, Pub. L. No. 65-182, 40 Stat. 704, 724, 738; Proclamation No. 138, 40 Stat. 1874, 1880–84 (1918).

As a result of the establishment of the Base and the purchase of the land by the United States, the Town of Quantico was "completely cut off . . . from the rest of Virginia, by land, save for the county or public road which had become Fuller Road." Watson, 80 F. Supp. at 650. However, because Fuller Road is the only road by which members of the public can travel to and from the Town, the United States' interest in Fuller Road was taken "subject to the right of ingress and egress in favor of the property located in Quantico." Id. at 651; accord United States v. Daniels, 471 F. Supp. 2d 634 (E.D. Va. 2007), aff'd, 267 Fed. App'x 228 (4th Cir. 2008).

Like other military installations, Base Quantico is a sensitive national security site. Base Quantico is especially sensitive because it "houses the Marine Corps' Presidential helicopter squadron as support for the President of the United States" and "serves as headquarters for the Marine Corps' Systems Command, training every Marine Corps officer, as well as many high-ranking foreign military officers." United States v. Tate, 129 F.3d 118, 1997 WL 693049, at *1 (4th Cir. 1997) (unpublished table opinion). Base Quantico also houses the FBI Academy, the Marine Corps University, and facilities used by the Drug Enforcement Administration. About, U.S. Marine Corps, https://www.quantico.marines.mil/Home/About/.

### II.  Access Control Policies

At all times relevant to the Complaint, access to Base Quantico (including Fuller Road) was subject to Marine Corps Installations-National Capital Region-Marine Corps Base Quantico Order 5530.2 ("Order 5530.2"), Pl.'s Ex. D, ECF No. 1-5, as supplemented at the direction of the Base Commander by the Interim Access Control Policy issued on December 2, 2020, Pl.'s Ex. E, ECF No. 1-6.

---

[2] The facts set forth are based on the allegations in the Complaint and the parties' filings on the Motion to Dismiss, including exhibits. The Court accepts allegations as true solely for purposes of ruling on the pending Motion to Dismiss.

A. **Order 5530.2**

Order 5530.2 limited access to Base Quantico "for authorized purposes only." Pl.'s Ex. D, at 1. "Because the Town of Quantico is located within the geographical boundaries of [the Base]," however, Fuller Road remained "accessible to the public for the sole purpose of transiting to and from the Town of Quantico." Id. Order 5530.2 instructed that "[t]here is no right of public access via other Gates." Id. at 2.

Under Order 5530.2, "[a]ll individuals that access [Base Quantico] are subject to access control measures," including, among others, "identity proofing" and "vetting." Id. "Identity proofing consist[ed] of reviewing federally authorized documentation to ensure authenticity of an individual." Id. Persons with certain forms of identification—such as a U.S. Passport, Federal Personal Identity Verification ("PIV") Credentials, or Department of Defense ("DoD") ID— could be given access to the Base, through Fuller Road, without further vetting, but "must still have [had] a legitimate reason for requiring access." Id. encl. 1 at 1. Those with other forms of identification—such as REAL ID drivers' licenses, school ID cards, ID cards issued by federal, state or local government officials, permanent resident cards, or foreign passports—were subject to additional vetting before access would be granted. Id.

"Vetting" involved the "evaluation of an individual's character and conduct, for approval, acceptance or denial onto the installation." Id. at 2. Enclosure 2 of Order 5530.2 set out categories of individuals who would "generally be denied access" to Base Quantico "[a]bsent a valid and current waiver." Id. encl. 2 at 1. These include individuals who were on a terrorist watch list, in the United States illegally, subject to an outstanding warrant, on work-release as a prisoner, or on parole. Id. Also categorically ineligible for access were registered sex offenders or persons convicted of a felony within the previous two years. Id. Additionally, the Base Commander retained discretion to deny access to any individual whom they determined might be "a detriment to the safety, security or good order and discipline of the installation." Id.

Order 5530.2 also prescribed other access control measures including "vehicular searches, personnel [sic] searches, and other security regulations." Id. at 2. Further, to gain entry, all commercial vehicles—defined as "any non-government vehicle, larger than a standard van"— had to be physically inspected at the Commercial Vehicle Inspection lot or, during non-duty hours, at the Base's entry gates. Id. encl. 4. Commercial vehicles with "sustained, long-term access requirements" were given the option of enrolling in the RAPIDGate Program, which allowed pass holders "to bypass the [Commercial Vehicle Inspection] lot and be granted access at the entry control points." Id. But all vehicles remained subject to random security screening and inspections. Id.[3]

---

[3] Order 5530.2 contained additional specific policies for government contractors, commissary baggers, hunter screening, role player screening, and the USACE Waterfront Area. See Order 5530.2 encls. 3, 5–8. These policies do not appear relevant to Ms. Nikolaisen's claims.

### B.  The Interim Access Control Policy Applicable at the Time Ms. Nikolaisen Purchased Her Property

#### 1.  Access to the Base Generally

As noted, the Base Commander issued an Interim Access Control Policy (the "Interim Policy" or "Access Control Policy") as an addendum to Order 5530.2 on December 2, 2020. Pl.'s Ex. E.[4] The Interim Policy reiterated that "all persons requesting access to [any] Marine Corps sites," including Base Quantico, "must be vetted" to "verify identity," "determine fitness," and ensure "a valid and authorized reason to access the base." Id. at 1. The policy provided that Base Quantico would use the Defense Biometric Identification System ("DBIDS") "to comply with vetting requirements and ensure only authorized persons are admitted to the installation." Id. As a result, individuals generally could only access the Base if they possessed DBIDS credentials.

Enclosure 2 of the Access Control Policy described the DBIDS registration process. Persons with a DoD Common Access or Teslin card would be "automatically registered in DBIDS upon having their credential scanned at the gate and [were] not required to go to the [Visitor Control Center ("VCC")]." Id. encl. 2 at 1. Individuals with federal PIV cards or DBIDS credentials from other installations were required to go to the VCC primarily to verify their purpose for accessing Base Quantico. Id.

"Unaffiliated persons," including, among others, contractors, guests of Town residents, and other visitors, could only secure unescorted access to the Base by undergoing vetting at the VCC. Id. The vetting process consisted of ID verification, confirmation of the individual's purpose for seeking access, and a fitness determination. Id. In addition, "unaffiliated persons" would have their photographs and digital fingerprints taken. Id.

Prospective visitors could pre-enroll online to expedite the DBIDS enrollment process. They would then be required to report to the VCC and present the pre-enrollment receipt, an "[a]uthorized form of identification (e.g.[,] REAL ID Compliant driver's license, passport, etc.)," sponsor contact information, and, if driving, a valid driver's license, proof of insurance, and vehicle registration. Id.

Per the Interim Policy, the VCC was only open from 6:00 AM to 3:00 PM on business days and 7:30 AM to 11:30 AM on Saturdays. Id. at 7. Because the Policy required individuals who were not registered in DBIDS to be vetted at the VCC, access to the Base might be denied to those individuals outside of the VCC's operating hours. The Interim Policy thus advised that

---

[4] In the Complaint and her response to the government's motion to dismiss, Ms. Nikolaisen also makes reference to the Interim Access Control Policy issued on March 19, 2020, Pl.'s Ex. C, ECF No. 1-4. See generally Compl.; Pl.'s Opp. The March and December policies do not differ from one another in any respect material to this case. The Court notes, however, that by the time Ms. Nikolaisen purchased the property, the December 2020 policy had superseded the March 2020 policy. See Compl. ¶ 15. In this Opinion, therefore, the Court refers only to the more recent December policy.

"[b]ecause the VCC is not open 24/7 and the vetting process can be time consuming, visitors requesting unescorted access must plan ahead and may need to register well in advance of their visit." Id. at 2. Visitor passes were available up to 14 days in advance. Id.

### 2. Enclosure 4: "Access Procedures for Town of Quantico"

Enclosure 4 of the Interim Policy provided rules specifically applicable to individuals travelling via Fuller Road to the Town of Quantico. It stated that "[b]ecause the Town of Quantico is located within the geographical boundaries of [the Base], town residents and property owners have the right to utilize Fuller Road . . . to access the Town." Id. encl. 4 at 1. "This right of access [was] for the sole purpose of transiting to and from the Town of Quantico" and "[did] not allow any detour, deviation, or access to other parts of [the Base], nor [did] it provide authority for any uses other than transit." Id.

Residents and property owners were required to show identification and proof of residency/property rights before being permitted access to Fuller Road. Id. To "facilitate such access," they also had the right to apply for and obtain, free of charge, DBIDS credentials which would allow quick access twenty-four hours a day. Id. Residents and property owners with DBIDS credentials could also be granted access to Russell Road, which was not otherwise available for public use. See id.

Visitors were also permitted to transit Fuller Road to access the Town, but, like other "unaffiliated persons," they were generally required to "first undergo security vetting at the VCC and be issued a DBIDS pass" each time they accessed the Base. Id. Frequent visitors, such as employees of businesses located in the Town of Quantico, could be granted DBIDS credentials which would allow them to travel along Fuller Road without first stopping at the VCC. Id. However, if the VCC was closed, a visitor without a DBIDS credential could only access Fuller Road if they were escorted by someone with an authorized credential, id. encl. 4 at 2, and then only if the escort had "sufficient knowledge of the co-travelers to legitimately vouch for their identity, fitness, and purpose," id. at 2 (describing the trusted traveler program).

### III. Ms. Nikolaisen's Purchase of Property in the Town of Quantico

Ms. Nikolaisen acquired real property located in the Town of Quantico in August 2021. Compl. ¶¶ 21, 23, ECF No. 1; see also Pl.'s Ex. B, ECF No. 1-3 (Deed). She purchased the property, which includes a single-family residence, as an investment, with the intent to use it for short-term rentals. Compl. ¶ 22. Shortly thereafter, she learned of the existence of the Access Control Policy. Id. ¶ 40.

Ms. Nikolaisen visited the VCC on or about August 26, 2021, to obtain an ID card that would establish that she owned property within the Town of Quantico. Id. ¶ 41. The employees at the VCC told Ms. Nikolaisen that she did not have the appropriate documents to obtain a DBIDS credential and suggested that she simply continue to use her DoD ID instead. Id.

Ms. Nikolaisen alleges that in September and October of 2021, she "regularly visited the Property to perform maintenance and other work in order to prepare it for use as a short-term rental." Id. ¶ 42. "On several occasions during this time period, she invited friends to come to the

Property to assist her." Id. "[I]n some instances," she says, her invitees were given permission to follow her to the Town on Fuller Road. Id. In others, however, her invitees were prevented from entering the Base or accessing her property. Id.

More specifically, Ms. Nikolaisen alleges that on October 5, 2021, the Marine Corps prevented a handyman who was following her in his own vehicle from entering Base Quantico. Id. ¶ 43. On October 7, 2021, she claims, she called four plumbing companies about performing work at her property. Id. ¶ 44. She states that only one was willing to do so and that it sought to charge her an extra fee up front which would be forfeited if the plumber was unable to get to her property. Id.

A few days later, on October 10, 2021, her first rental guest arrived. Id. ¶ 45. Even though the VCC was closed, the guest was permitted to travel to Ms. Nikolaisen's property via Fuller Road. Id. The next day, however, he exited the Base and, upon his return, was stopped and told that he would be permitted to access the property only for purpose of retrieving his belongings. Id. As a result, he "check[ed] out of the Property a day early, receiving a refund from [Ms.] Nikolaisen." Id. On October 21, 2021, a guest with a reservation to rent the property on October 23 cancelled that reservation because "he was uncertain whether he could access the Property if he arrived when the VCC was closed." Id. ¶ 46.

In early November 2021, an HVAC repairman Ms. Nikolaisen hired arrived at the VCC at 2:30 PM but was unable to proceed to her property because his work truck had to undergo a different security inspection at a location—presumably the Commercial Vehicle Inspection lot—which had closed at 2:00 PM. Id. ¶ 47. On December 8, 2021, a pest control company cancelled service "because its technicians did not carry REAL IDs and would be unable to access the Property because they could not obtain DBIDs credentials at the VCC." Id. ¶ 48.

Finally, Ms. Nikolaisen asserts, since she opened the property up to prospective renters, "dozens of guests" have booked it "only to cancel upon learning about the requirement to visit the VCC with documents such as birth certificate, passport or social security card." Id. ¶ 49. She alleges that she "has lost out on thousands of dollars of rental income because of cancelled listings and guests leaving the Property early and obtaining refunds" and "has either been unable to have certain services—such as pest control or HVAC work—performed at her property; or has had to expend significantly more funds for such services to be performed." Id. ¶¶ 50–51.

While Ms. Nikolaisen does not identify any specific instances of her invitees being denied access after December 8, 2021, she generally claims that these difficulties persisted at least until May 2, 2023, when Order 5530.2 was replaced with Order 5530.2a. See Compl. ¶¶ 49–51; Pl.'s Opp. to Def.'s Mot. to Dismiss ("Pl.'s Opp.") at 2 n.2, ECF No. 8 (citing Def.'s Mot. to Dismiss at 14 n.3). Order 5530.2a revamped procedures governing access to the Town of Quantico to provide more specific rules and to generally lessen access restrictions. See generally Def.'s Ex. 3. Among other things, Order 5530.2a permits service contractors to access Fuller

6

Road even when the VCC is closed, expands residents and property owners' escort privileges, and adds specific provisions for short-term renters. Def.'s Ex. 3 encl. 5.[5]

### IV.   This Action

Ms. Nikolaisen brought this action on October 15, 2024. Compl., ECF No. 1. She alleges that the Interim Policy had "the effect of physically preventing her and her invitees and licensees from reasonably accessing the Property, including by turning away short-term rental guests, contractors, and others invited to the Property by [Ms.] Nikolaisen or renting the Property from [Ms.] Nikolaisen." Id. ¶ 60. According to Ms. Nikolaisen such access was precluded for at least the more than 70% of time each week that visitors could not obtain a DBIDS pass or credential because the VCC was not open. Id. ¶ 61

Moreover, Ms. Nikolaisen alleges that she "has the right to exclude others from the Property, which right comes with the corresponding right to include or decide who to exclude and who to permit to enter the Property." Id. ¶ 65. She states that in promulgating the access control policies and "enforcing those policies via armed guards at the barricade along Fuller Road," the government has taken from her "the ability to exercise her right to exclude and to include." Id. ¶ 66.

## DISCUSSION

### I.   Standard of Review

When considering a motion to dismiss for failure to state a claim, the court "must accept as true all the factual allegations in the complaint" and "indulge all reasonable inferences in favor of the non-movant." Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001). The court also draws facts from the exhibits attached to the parties' pleadings. See Rocky Mt. Helium, LLC v. United States, 841 F.3d 1320, 1325 (Fed. Cir. 2016); see also RCFC 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes."). The court, however, is not required to "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).

A complaint is subject to dismissal under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002). To avoid dismissal under RCFC 12(b)(6) "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the

---

[5] Although not entirely clear, in her response to the government's Motion to Dismiss, Ms. Nikolaisen appears to now be characterizing the alleged taking of her property resulting from Order 5530.2 as temporary in nature, ending when Order 5530.2a was issued. Pl.'s Opp. at 2 n.2.

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678 (citing Twombly, 550 U.S. at 556).

## II. The Facts Alleged by Ms. Nikolaisen in Her Complaint, Taken as True, Do Not Establish a Fifth Amendment Taking

### A. Legal Standards

The Fifth Amendment's Takings Clause provides that "private property" shall not be "taken for public use, without just compensation." U.S. Const. amend. V. Its purpose is to prevent the "Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 123 (1978) (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960).

To prove entitlement to compensation under the Takings Clause, the claimant bears the burden of establishing the existence of a protectible property interest. Gadsden Indus. Park, LLC v. United States, 956 F.3d 1362, 1368 (Fed. Cir. 2020); see also Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir. 2002) (stating that, in analyzing a takings claim, the court must first determine "whether the plaintiff possesses a valid interest in the property affected by the governmental action, i.e., whether the plaintiff possessed a 'stick in the bundle of property rights'" (quoting Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374 (Fed. Cir. 2000)). If a claimant establishes the existence of a protectible property interest, she must then show that the government action about which she complains "amounted to a compensable taking of that property interest." Am. Pelagic Fishing Co., v. United States, 379 F.3d 1363, 1372 (Fed. Cir. 2004) (citing Chancellor Manor v. United States, 331 F.3d 891, 902 (Fed. Cir. 2003)).

There are two categories of takings: physical and regulatory. Yee v. City of Escondido, 503 U.S. 519, 522–23 (1992). "A physical taking generally occurs when the government directly appropriates private property or engages in the functional equivalent of a 'practical ouster of [the owner's] possession.'" Washoe Cnty. v. United States, 319 F.3d 1320, 1326 (Fed. Cir. 2003) (quoting Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1014 (1992)). A regulatory taking occurs when government regulations "unduly burden private property interests." Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1213 (Fed. Cir. 2005). "The essential question" for purposes of distinguishing between physical and regulatory takings "is whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property." Cedar Point Nursery v. Hassid, 594 U.S. 139, 149 (citing Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency, 535 U.S. 302, 321–23 (2002)).

### B. Physical Taking

Ms. Nikolaisen argues that the facts alleged in her Complaint establish that the Marine Corps' policies effected a physical taking of her property because they "directly interfered with her right to reasonable access to her property . . . [by] constructing a physical barrier and enacting [restrictive] policies." See Pl.'s Opp. at 15; see also Compl. ¶ 64 (citing Wood v. City of Richmond, 148 Va. 400, 406–07 (1927)) (stating that under Virginia law property owners

8

"have a right to access their properties"). But, as noted, a physical taking occurs "when the government encroaches upon or occupies private land for its own proposed use." Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001). Ms. Nikolaisen has not alleged that the government encroached upon or otherwise appropriated her real property. She also does not allege that the government required her to permit others to occupy her property. Cf. Cedar Point Nursery, 594 U.S. at 149 (holding regulation that grants union organizers a right to physically enter and stay on growers' property "appropriates a right to invade the growers' property and therefore constitutes a per se physical taking").

Instead, Ms. Nikolaisen alleges the government has imposed requirements that made it more difficult for her guests to access her property via Fuller Road. Courts, however, have only "recognized a [physical] taking where the government denies all meaningful access to the claimant's private property." Washoe Cnty., 319 F.3d at 1326 (citing Laney v. United States, 661 F.2d 145, 147–49 (Ct. Cl. 1981)). The allegations in Ms. Nikolaisen's Complaint, taken as true, do not establish a plausible claim that the government has denied her all meaningful access to her property in the Town of Quantico. The Interim Policy did not entirely prohibit travel along Fuller Road or prevent her from accessing the Town by rail or boat. Cf. Estate of Hage v. United States, 687 F.3d 1281, 1290 (Fed. Cir. 2012) (stating that "entirely fenc[ing] off a water source, such as a lake, and prevent[ing] a water rights holder from accessing such water" would constitute a physical taking); Foster v. United States, 607 F.2d 943, 950 (Ct. Cl. 1979) (holding the government's repeated refusal to grant owners of mineral interests access to tract of land constituted a compensable permanent taking); Roth v. United States, 73 Fed. Cl. 144, 148 (2006) ("It is well[ ]settled that a closure in which defendant physically bars access to lands comprises a physical taking."). The policies merely impose ID and vetting requirements. And the allegations in the Complaint show that Ms. Nikolaisen has always been able to meet those requirements and obtain access to Fuller Road by showing her DoD ID.

In short, taken as true, the allegations in Ms. Nikolaisen's Complaint show, at most, that the access policies applicable to the Base have discouraged some prospective customers from renting her property, and have had the incidental effect of making it more difficult or expensive to hire repairmen. Those allegations do not plausibly establish that her property has been invaded or that she has been denied all meaningful access to her property. Therefore, Ms. Nikolaisen has not alleged facts sufficient to show a physical taking of her property.

### C.     The Right to Include

Ms. Nikolaisen also alleges a taking of what she calls her "right to include." Compl. ¶ 65. She notes that Cedar Point Nursery and related cases establish that one of the sticks in a property owner's bundle of rights is the right to exclude others from their property. Pl.'s Opp. at 9. Based on this right to exclude she claims "a corresponding right to decide who to permit to enter the Property," which she characterizes as a "right to include." Compl. ¶ 65; Pl.'s Opp. at 9–10, 13–14.

But even assuming such a right exists the governmental actions at issue here do not prevent Ms. Nikolaisen from exercising it.[6] The access policies do not restrict who Ms. Nikolaisen may invite to her property or to whom she may rent it. At most, they impose access limitations on others which she claims have had incidental negative effects on her economic interests. Those incidental effects cannot serve as the basis for a viable takings claim on her part.

The court of appeals' decision in Air Pegasus of D.C., Inc. v. United States, is instructive. 424 F.3d 1206 (Fed. Cir. 2005). The plaintiff in that case, Air Pegasus, owned and operated a heliport business in Washington, D.C. Following the terrorist attacks of September 11, 2001, the Federal Aviation Administration temporarily and then permanently restricted commercial traffic in the airspace around Air Pegasus's heliport. Id. at 1209–10. As a result, Air Pegasus was not able to have flights land on its premises, and it was ultimately forced to cease operating. Id. at 1210.

Air Pegasus contended that the restrictions the FAA imposed on the air space around its heliport resulted in a taking of its interest in its business as a heliport. Id. The Court rejected this argument. It pointed out that "a claimant seeking compensation from the government for an alleged taking of private property must, at a minimum, assert that its property interest was actually taken by the government action." Id. at 1215. The FAA regulations prohibited the operation of helicopters but, the court of appeals explained, Air Pegasus did not own helicopters. Id. Therefore, "Air Pegasus's economic injury is not the result of the government taking Air Pegasus's property." Id. Instead, it was "the more attenuated result of the government's purported taking of other people's property." Id. "This circumstance," the court held, "does not form the basis for a viable takings claim." Id. "[T]here is a significant difference between an injury to one's property interest and a taking of one's property interest." Id. (citing Omnia Com. Co. v. United States, 261 U.S. 502, 510 (1923) ("If, under any power, a contract or other property is taken for public use, the government is liable; but, if injured or destroyed by lawful action, without a taking, the government is not liable.")).

Similarly, in Huntleigh USA Corp. v. United States, the plaintiff (a provider of airport security screening services) alleged a taking when the government enacted the Air

---

[6] Ms. Nikolaisen has not cited any Virginia case law recognizing a "right to include" as a cognizable property interest. She relies instead upon Justice Ginsburg's dissent in Minnesota v. Carter, 525 U.S. 83 (1998). Pl.'s Opp. at 9 (citing 525 U.S. at 107 (Ginsburg, J., dissenting)). But Justice Ginsburg's discussion of a right to include in that case had nothing to do with property law. It concerned whether invitees to an apartment who were there to help bag cocaine had a reasonable expectation of privacy in the apartment, for Fourth Amendment purposes. Her view was that "when a homeowner or lessee personally invites a guest into her home to share in a common endeavor, whether it be for conversation, to engage in leisure activities, or for business purposes licit or illicit, that guest should share his host's shelter against unreasonable searches and seizures." 523 U.S. at 106.

Transportation Security Act and "assign[ed] all airport screening responsibilities to the TSA, rather than commercial airlines." 525 F.3d 1370, 1374–75 (Fed. Cir. 2008). The Act, however, did not directly regulate the plaintiff, notwithstanding that it "effectively eliminated the market" for the plaintiff's services. Id. at 1375. The plaintiff was "alleg[ing] that it suffered a loss of business as a result of the government's regulation of a third party." Id. at 1380. The court of appeals concluded that the indirect frustration of the plaintiff's business expectations "[did] not form the basis of a cognizable takings claim." Id. (first citing Air Pegasus, 424 F.3d at 1216; and then citing Omnia, 261 U.S. at 510).

The same reasoning applies here. Ms. Nikolaisen bases a claim that her "right to include" was taken on allegations that the government's security screening procedures made it more difficult for her invitees to access her property via Fuller Road, thereby adversely affecting her ability to find renters for her property. These allegations, taken as true, establish that Ms. Nikolaisen's economic interests were adversely affected by restrictions the access policies placed on others. As Air Pegasus, Huntleigh, and Omnia show, incidental frustration of a property owner's economic expectations arising out of the regulation of third parties does not provide a viable basis for a takings claim. See also NL Industries, Inc. v. United States, 839 F.2d 1578, 1579 (Fed. Cir. 1988) (citing Omnia, 261 U.S. 502) ("[F]rustration of a business by loss of a customer [is] not a taking."); United States ex rel. Tenn. Valley Auth. v. Powelson, 319 U.S. 266, 282 (1943) ("Frustration and appropriation are essentially different things." (quoting Omnia, 261 U.S. at 513)). Ms. Nikolaisen's argument that she has stated a claim for a taking of her "right to include" therefore lacks merit.

### D. The Taking of An Alleged Easement

As noted above, the United States' property interest in Fuller Road is "subject to the right of ingress and egress of the property located in Quantico." Watson, 80 F. Supp. at 651. Ms. Nikolaisen characterizes this right of ingress and egress as an "easement" that belongs to her and other owners of real property located in the Town. Pl.'s Opp. at 8 (citing Watson, 80 F. Supp. at 651); see also Compl. ¶ 7 (pronouncing an "easement of access that Nikolaisen owns, which is connected to the property and provides access along Fuller Road").

But the right of ingress and egress, which Ms. Nikolaisen characterizes as an "easement," is subject to certain "background principles" that limit any property rights she might assert. See Am. Bankers Ass'n v. United States, 932 F.3d 1375, 1385 (Fed. Cir. 2019) ("Property interests arise from 'existing rules and understandings and background principles derived from an independent source, such as state, federal, or common law.'" (quoting Air Pegasus, 424 F.3d at 1213)); see also McCutchen v. United States, 14 F.4th 1355, 1365 (Fed. Cir. 2021) (holding that federal firearms statutes precluded gun dealers from asserting cognizable property interest in continued possession of bump stocks). In particular, those background principles include the fact that, "throughout our history," "commanding officers of military installations" have exercised the "unquestioned authority" to control access to those military installations. Cafeteria & Rest. Workers Union v. McElroy, 367 U.S. 886, 892 (1961). As the Supreme Court observed in Cafeteria & Restaurant Workers Union, "[i]t is well settled that a Post Commander can, under the authority conferred on him by statutes and regulations, in his discretion, exclude private persons and property therefrom, or admit them under such restrictions as he may prescribe in the interest of good order and military discipline" Id. (quoting JAGA 1925/680.44, 6 October 1925).

Indeed, Ms. Nikolaisen's Complaint expressly acknowledges that visitors seeking to travel along Fuller Road to properties in the Town of Quantico—including Plaintiff's property—have long been subject to access control regulations implemented to protect base security. See Compl. ¶ 26 (admitting that "[s]ince the 1980s, the Marine Corps has operated a guarded gate and security barrier along Fuller Road, by which it controls and restricts access to Fuller Road and to the Town of Quantico, including to the Property [at issue]"). Those regulations have in fact been in effect beginning decades before Ms. Nikolaisen bought her property in August 2021. See, e.g., Tate, 129 F.3d 118, 1997 WL 693049.

The rights of members of the public to obtain ingress and egress to the Town via Fuller Road are therefore subject to the authority of the Marine Corps to impose reasonable security regulations like those contained in its access control policies. Such federal authority "constitutes a 'background principle' that inheres in the title to property interests" that are obtained after their imposition. Bair v. United States, 515 F.3d 1323, 1329 (Fed. Cir. 2008). And that background principle "preclude[s] a takings claim based on the application of the [authority] to those property interests." Id.

## CONCLUSION

For the foregoing reasons, assuming the allegations in Ms. Nikolaisen's Complaint are true, they do not establish a taking of a cognizable property interest. Therefore, pursuant to RCFC 12(b)(6), the government's Motion to Dismiss, ECF No. 7, is **GRANTED**. Ms. Nikolaisen's Complaint is **DISMISSED** for failure to state a claim.

The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan  
ELAINE D. KAPLAN  
Judge
